## THE SAALE.[1]

### TROUTON et al. v. THE SAALE.

(District Court, S. D. New York. January 29, 1894.)

1. COLLISION—FOG—IMMODERATE SPEED—FIFTEEN KNOTS.
    In a fog so dense that a vessel cannot be seen until within 1,200 or 1,400 feet, a speed of 15 knots is not moderate speed.

2. SAME—STEAM OR SAIL—CHANGE OF COURSE—SPEED OF STEAMSHIP CONTRIBUTING TO COLLISION.
    A steamship and a bark collided in a fog, the collision resulting in the sinking of the bark. It appeared that the primary cause of the collision was a change of some 5 points on the part of the sailing vessel; but the evidence showed that the steamship was going at the rate of about 15 knots; that she saw the sailing vessel at a distance of about 1,350 feet, and at once put her helm hard a-port, and stopped and reversed her engines, but was unable to avoid collision. Computation showed that, had her speed been 9 or 10 knots, instead of 15, she would have passed well clear of the bark, notwithstanding the latter's change of course; and that, had her speed been only 8 knots, she would have been stopped before reaching the line of the bark's course. *Held*, that the speed of the steamship contributed to the collision, rendering her liable to the owners of cargo on the bark for their loss.

In Admiralty. Libel for collision. Decree for libelants.

Wing, Shoudy & Putnam, for libelants.
Shipman, Larocque & Choate, for the Saale.

BROWN, District Judge. The above libel was filed in behalf of the consignee and insurers of the cargo of the Norwegian bark

[1] Reported by E. G. Benedict, Esq., of the New York bar.

Tordenskjold to recover the damages arising from a collision between the bark and the North German Lloyd steamship Saale, whereby the bark was sunk on the high seas and lost, at about 7 P. M., a little after sunset on August 4, 1892, about 800 miles east of Sandy Hook, in thick fog. The libelants ascribe the collision to the high speed of the steamer in fog; the claimants, to the bark's change of course.

The steamer was on one of her regular trips from New York, sailing E. ¼ S. by compass. She was a first-class passenger steamship, 460 feet long, by 67 feet beam, 4,765 tons register, and 7,500 horse power. Her speed was then about 15 knots. The wind was light from the west-southwest and variable.

The bark was about 200 feet long, and making from $3\frac{1}{2}$ to 4 knots per hour. She was supplied with one of the best mechanical fog horns, which I find was properly blown at regular intervals, giving two blasts as she was upon the port tack. Until the steamer's whistles were heard, she was sailing about northwest. Before she was seen, her fog horn was not heard upon the steamer. The bark had been for some time in thick fog. But there was not much fog where the steamer was until 15 or 20 minutes before collision. The weather was hazy, with occasional showers of fog, and becoming thicker, all the usual preparations were made for thick fog. Her whistle was sounded regularly for about 15 minutes before the collision. About 5 minutes before collision, as the evidence constrains me to find, the fog became dense about the steamer, and shortly afterwards—not over a minute before collision—the first notice to the steamer of the near presence of the bark was the sight of her sails, which, according to the testimony of the master, and of the first and fifth officers, who were on the bridge, appeared to be about half a point on her starboard bow, and at a distance estimated by them to be from 1,200 to 1,400 feet. The steamer's full speed was 16 knots; but her steam pressure had been previously somewhat reduced and her speed slackened from 16 knots to 15. Her helm, on sight of the bark, was at once ordered hard a-port, and the engine reversed as soon as possible. The steamer's stem, however, struck the port side of the bark between the fore and main rigging and cut half or three-quarters through her, causing her to sink as soon as the steamer cleared.

The whistles of the steamer had been heard by Wolf, the wheelman on the bark, about 10 minutes before. There is a conflict in the testimony whether, when the whistles were first heard, the master and mate were on deck or not. I consider this immaterial; for they were on deck about 5 minutes before collision, and besides hearing the steamer's whistles, they heard the noise of her approach in the water, before she could be seen. Wolf, the wheelman, testified that some 5 minutes before collision, noticing the continued approach of the whistles off his port bow, he gradually turned his wheel to port, and continued doing so until it was hard over at the time when the steamer was sighted; and that this was done without orders, because he thought it necessary to get out of the way of the steamer. From the fact that this witness has been more or less in the care and employ of the claimants ever since the

collision, whatever suspicions might attach to his testimony, if it was unconfirmed, the confirmation which his testimony receives from the libelants' as well as from the claimants' witnesses, does not permit the finding that his story is a fabrication. The master of the bark, and almost all the other witnesses, testify that the angle of collision was as much as seven points between the bows of the two vessels; and the master of the bark was so struck with this large angle, that he testified that in order to produce it the steamer must have turned three or four points to port. There can be no doubt, however, of the fact that the steamer, instead of turning to port, turned somewhat to starboard; not only because the order was given to port her wheel, but because her propeller, while her engine was reversed, would undoubtedly bring her head to starboard; and her master testifies that he observed the compass at collision, and that she was then heading E. S. E., showing that she had veered a point and three-quarters to the southward. If, then, the angle of collision was such as the great weight of testimony shows it to have been, viz., about seven points, there is no escape from the conclusion that the bark did change her course as much as five points; and this agrees with Wolf's testimony as to porting his wheel, though he did not observe the compass heading of the bark just before collision. Without referring to further details of the testimony, none of which is sufficient to overcome, or otherwise explain the above facts, it is evident from an inspection of the relative positions of the two vessels, that the bark's change of course to starboard, after hearing the steamer's whistle, brought about the collision; and that without such change the steamer would unquestionably have passed her by a good margin without collision. This fixes the primary responsibility for the collision upon the bark, and with that, the sole responsibility also, unless it further appears that the speed of the steamer was not moderate, within the thirteenth article of navigation, and that this fault presumably contributed to the collision.

The evidence shows that when the bark was first seen she could not have been over 1,400 feet distant, the highest estimate of the Saale's officers; while the libelants' witnesses, and the lookout on the Saale, estimate the distance at only 600 feet. Whichever is correct, the fog was of such density as made the thirteenth article applicable, and required the Saale to go at "moderate" speed. Under the decisions binding upon this court, I am not at liberty to regard a speed of over nine knots, in a fog of that kind, as moderate speed. The Nacoochee, 137 U. S. 339, 11 Sup. Ct. 122; The Bolivia, 1 C. C. A. 221, 49 Fed. 169. I am obliged to hold, therefore, that the Saale was sailing in violation of the thirteenth article, and the only remaining question is whether this was a material fault contributing to the collision.

Upon this point, the claimants invoke the benefit of the rule, that where, as in this case, the collision has been plainly, and by undoubted testimony, brought about by the gross fault of one of the vessels, such as a change of course of five or six points, whereby she ran under the bows of the steamer, and this fault is plainly sufficient to account for the disaster, without which it would not have

happened, "it is not enough for such vessel to raise a doubt with regard to the management of the other vessel; there is some presumption at least adverse to this claim, and any reasonable doubt with regard to the conduct of the other vessel should be resolved in its favor." Per Mr. Justice Brown, in The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211.

This evidently just rule is not, I think, applicable here; for we have not here to deal with any doubt in regard to the management of the steamer, as respects her speed of 15 knots; for this is admitted. Nor am I permitted to hold that this speed was not moderate. Whether this excessive speed contributed to the collision; or, in other words, whether the collision would have happened substantially the same had the steamer been going at such moderate speed as article 13 requires, is a wholly different question; and on this point the burden of proof is upon the steamer.

Considering that under the circumstances of this case the steamer ought to be exempted from liability if it is reasonably certain that the difference of speed would have made no substantial difference in the result, I have given that question as careful an investigation as I am able, after the further hearing of counsel upon that point. I am satisfied, however, from this examination, that if the Saale had been going at the rate of 9 or even 10 knots instead of 15 knots at the time when her engines were ordered to be reversed, the bark would have passed well clear to the northward before the steamer reached the line of her course.

In reaching this conclusion, I adopt most of the data assumed by the distinguished counsel for the claimants; namely, the speed of the bark at three and eight-tenths knots; that at collision she was heading N. ½ E., and the steamship E. S. E.; that the bark was seen a minute before collision; that the order to reverse the engines of the steamer was then given, and her helm at the same time ordered hard a-port; that in 10 seconds afterwards her engines began to move backward; that the ship, under the combined action of her port helm, and reversed engines—being a right-handed propeller—veered to starboard a point and three-quarters before collision; and that in order to avoid the collision the bark must have had time to move to the northward 147 feet further; that is, at least 24 seconds more time before the steamer reached the line of her course. These data seem to me to accord substantially with the weight of the testimony. The master's testimony further shows that the full speed of the Saale was 16 knots, and that from full speed it takes four minutes, under reversed engines, to bring her to a standstill. In the latter respects, as well as in size and model, the Saale approximates so nearly to the Normandie, and to the Aurania, that the observations made in regard to the movements of those vessels are valuable, as confirmatory of the testimony in the present case. See The Normandie, 43 Fed. 151, 159–161; The Aurania, 29 Fed. 123.

The distance of the vessels apart when the bark was first sighted, and the time that elapsed between then and the collision, are of the greatest importance. The counsel for the claimant assumes a distance of 846 feet only, as the average of all the estimates; but

neither that method, nor its result, can be admitted as correct in this case, because it is wholly incompatible with more definite testimony which proves a much greater distance. The time assumed by the claimant's counsel is one minute; the master called the time a minute or a minute and a half. The engineer's testimony to 30 or 40 revolutions backward before collision, and the lapse of 10 seconds before the engine began to move backward, does not admit of less than a minute's interval; and the change of 1¾ points to starboard while reversing would require at least that time.

Taking, therefore, 1 minute as the least admissible interval, and 50 seconds as the time of actual reversal of the engine before collision, it is evident that the Saale, while diminishing her speed from 15 knots to 9 or 10, as the master states, could not have gone a less distance than that given by the average speed of 12½ knots during the interval of 50 seconds, and that would be 1,020 feet. Adding 250 feet for the 10 seconds before reversal, would make 1,270 feet as the distance of the Saale from the point of collision when the bark was first seen.

The bark, during the same interval, would change about two points. When first seen, she would therefore be heading about N. N. W., and at her given speed she must have advanced upon her course, swinging to N. ¼ E., about 350 feet. On tracing diagrams of these positions, the bark will be found to be about 1,350 feet from the steamer when first seen, and bearing one and a half points on the steamer's starboard bow. These results accord so well with the officers' estimates of the distance apart, and with the testimony of the boatswain as to the bark's bearing (who was in the best possible position to observe accurately, viz., from the steamer's rail), that I can have no doubt of their proximate correctness.

Adopting, then, the distance of from 1,000 to 1,050 feet as the distance advanced by the Saale from the time of reversing until collision, computation shows that if her speed had been 9 or 10 knots instead of 15 knots, at the time when she reversed, she could not have advanced from 1,000 to 1,050 feet in less than from 85 to 110 seconds; and that the bark would consequently have been from 100 to 300 feet clear to the northward at the time when the steamer reached the line of her course; and that had the steamer been going at a speed of 8 knots only, she would have stopped still in the water from 100 to 150 feet before reaching the bark's path. These computations are easily made, if desired, upon the data furnished by the evidence in this case, in the same manner as shown in the tables in respect to The Normandie, 43 Fed. 151, 159–161, where the data were substantially the same.

The result in this instance agrees with the presumption often stated, that where the steamer is chargeable with the statutory fault of excessive speed, that fault presumably contributed to the collision, unless she proves that it could not have done so. The Pennsylvania, 19 Wall. 126; The Bolivia, 1 C. C. A. 221, 49 Fed. 171. It is always open to her to prove this if she can. The City of Rio Janeiro, cited in The Normandie, 43 Fed. 156. As the evidence in the present case, however, confirms the legal presumption, the libelants are entitled to a decree, with costs.