THE LAURA V. ROSE.[1]

MASER and others *v*. THE LAURA V. ROSE.

*(District Court, S. D. New York.   June 26, 1886.)*

1. COLLISION — STEAMER AND SCHOONER — CLOSE APPROACH BY STEAMER TO SCHOONER'S COURSE — YAWING — CHANGE OF HELM BY SCHOONER — APPORTIONMENT.

Where a steamer and a schooner were approaching each other, nearly head on, at night, in the Delaware river, and the steamer shaped her course so as to pass within 50 or 75 feet of the port side of the schooner, and when close together the schooner suddenly changed her course, probably to correct previous yawing, and ran into the steamer's side, it was held that the schooner was in fault for her change of course, and that the steamer was also to blame for her imprudent navigation in shaping her course so close to the course of the schooner.

2. SAME — DUTY OF STEAMER TO KEEP AWAY BY REASONABLY SAFE MARGIN.

Reasonable prudence. and a due regard for the safety of life and property upon the water, demand that steamers, bound to keep out of the way of sailing vessels, shall, when nothing prevents, keep away by a reasonably safe margin; and that any disregard of this obligation, without excuse, resulting in collision, shall be held a fault, notwithstanding a change of course by the other vessel.

In Admiralty.

*Carpenter & Mosher*, for libelants.

*J. Warren Coulston* and *Goodrich, Deady & Goodrich*, for claimants.

BROWN, J.   The libel in this case was filed to recover for the damages sustained by the steam canal-boat Thomas Carroll, which was sunk by a collision with the three-masted schooner Laura V. Rose, in the Delaware river, near Edgemoor, about 11 P. M., on December 10, 1884. The night was clear, and the available channel about half a mile wide, and without obstruction to either vessel.   The Rose was light, sailing up river, against the ebb-tide, wing and wing, until a few minutes before the collision, and making about a mile and a half an hour by land.   The Carroll had a cargo of 210 tons of sand, and was bound down from Philadelphia to Baltimore, making about 4½ miles per hour.   She had on her starboard side, as consort, a canal-boat, which projected some 40 feet ahead of the bows of the Carroll, and was loaded with some 200 tons of sand.

The libel alleges that as the Carroll was coming down the river, at about 11 P. M., the green light of the schooner was seen a little on the steamer's starboard bow, and nearly ahead, from one to two miles distant; that the steamer then starboarded her wheel so as to show her own green light; that afterwards the schooner, crossing the steamer's bow, showed her red light, upon which the steamer's wheel was ported so as to show her red light; that they proceeded in this

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

manner, showing red to red, until a few moments before the collision, when the schooner again changed her course, so as to show her green light, upon which the steamer's engines were reversed, but the collision was then inevitable, and the steamer was struck on her port side by the schooner's stem, and shortly afterwards sank.

The answer states that both the steamer's colored lights were seen from the schooner when from one to two miles distant, right ahead; that the schooner was then sailing N. E. ½ N.; that the steamer directly afterwards shut in her red light, and showed her green light only, and so continued; the vessels showing green to green, without any change in the schooner's course, until a few moments before the collision, when the steamer ported, attempting to run across the schooner's bows, and showed her red light, rendering collision inevitable; upon which the schooner ported to ease the blow, but without effect.

These two accounts of the collision cannot be reconciled, as they stand. They both agree, however, in certain changes of lights, as seen by each. One of the counsel for the claimants seeks to reconcile the accounts, in part, upon the theory that the schooner's green light was first seen from the steamer when the schooner was at or below buoy 22½, before she had made a change of about two points to the eastward to a course N. E. ½ N., which is the proper change at that buoy. I am constrained to reject this theory, however, because it is not compatible with the testimony on either side, nor with the statements in the answer. Buoy 22½ is at least half a mile below Edgemoor, a mile below the lower range light, and a mile and three-quarters below the upper range light. The claimants' mate, who was in charge of the navigation, testified that the collision took place near the upper range light, and that he was near the lower range light when he first saw the steamer. The master of the steamer says the collision took place about opposite the lower range light. If either is approximately correct, the schooner must have passed buoy 22½, and changed to her course of N. E. ½ N., from three-quarters of an hour to an hour before the collision, long before her lights were visible to the steamer; and both the answer and the mate's testimony are to the effect that the steamer's lights were not seen until after the change of course had been made, and apparently some considerable time after.

The testimony of the witnesses on both sides is more than usually unsatisfactory, through the manifest and gross inconsistencies that nearly all of them exhibit. That there was a sudden change of course by one of the two vessels across the bows of the other very shortly before the collision, is, I think, certain. In behalf of the schooner, it is urged that it is incredible that, if the vessels were approaching with the lights showing red to red, as the libelants' witnesses claim, the schooner should, without cause, have starboarded so as to run into the steamer. But the improbability is precisely the same as respects the steamer. It is equally incredible that if the vessels were running

safely green to green, as the schooner's witnesses allege, the steamer should, without cause, and when very near, have suddenly ported, and crossed the schooner's bows, and then reversed her engines, so as to be run into nearly amid-ships, and sunk. From a common-sense point of view, each vessel should have the benefit of this improbability; provided that each is shown to have been attentive to the other, and watching her own navigation, and that no circumstances appear that could rationally account for such a change.

There are, however, three important circumstances in the case that, in my judgment, determine this conflict in the steamer's favor.

1. During the 10 minutes preceding the collision there was practically no lookout upon the schooner. Smith, the lookout, had been called by the mate to jibe the mainsail from port to starboard, and to clew up the main-topsail. As soon as this was done he was ordered aloft to shift the foretop sail sheets, and the wheelsman was also ordered aloft to the main-topsail, while the mate, the only other person on deck, relieved the wheelsman. During this considerable interval there was no one acting as lookout, and evidently no watch was kept upon the steamer. The collision took place while the two men were going aloft. What the lookout says he saw as regards lights and position while he was on the rattlings is too contradictory to be relied on.

2. When the mainsail was jibed to port, the foresail being also on the port side, the immediate natural effect would be, if not counteracted by the helm, to throw the schooner's stern to port, and her head to starboard. The liability of the schooner to this change, and to yaw widely with the wind aft, would be much increased, unless she was carefully steered, by the fact that she was not loaded, but sailing light. *The Excelsior*, 12 Fed. Rep. 195, 198. This alone would have been sufficient to account naturally for the schooner's change of heading enough to show a change of her lights from green to red; and the time when the mainsail was jibed over, according to the mate's testimony, agrees with the time when, by the steamer's story, a similar change of lights was seen, viz., when about three-fourths of a mile distant, *i. e.*, about seven minutes before the collision.

3. Three witnesses testify that immediately after the collision the person in charge of the schooner, *i. e.*, the mate, in answer to the inquiry by the captain of the steamer why the schooner had not kept off, replied that "he didn't see her." Of these circumstances, the first two appear from the claimants' evidence; the last, by the clear weight of proof. The testimony of the lookout, Schmidt, is, as I have said, marked by such contradictions, and his memory is manifestly so imperfect, that no reliance can be placed upon his statements as to the lights visible, or the position of the steamer, at any particular time. The mate testifies that he went forward, and saw the steamer's green light on the starboard bow. The lookout says the mate was not forward at all. If he was forward at all, it was probably before he

called the lookout aft to help jibe the mainsail and clew up the topsail. If the steamer was on his starboard bow during the last 10 minutes before the collision, as he says she was, inasmuch as there were no sails on that side, and nothing to obstruct his view from aft, there was no reason for his going forward in order to see the steamer. Before the mainsail was jibed over there was reason for his doing so.

As respects the steamer, on the other hand, there are no circumstances that indicate any want of proper watch of the schooner. The acts done by her indicate constant attention to the schooner. The schooner's lights were evidently seen; there was nothing to obstruct the view; there was an adequate watch kept up; the reversal of the steamer's engines shows she was watching the schooner; and it is scarcely credible that if she had attempted to cross the schooner's bow when close to her, as the claimant alleges, she would have reversed her engines when actually crossing. In such a conflict, the story of the vessel on which no adequate watch is maintained is of inferior credit, (*The Excelsior, supra;*) and upon this circumstance, and the other circumstances mentioned, the weight of proof must be held to be with the libelants. The latter furnish a possible, and entirely natural, explanation of the collision, though discrediting, of course, some of the statements of the claimants' witnesses; as some statements on the one side or the other must, in any view, be discredited.

The probable explanation of the collision is that all the time the two vessels varied but little from directly ahead of each other; that a slight change of heading by either would cause a change of the light visible to the other, and a little progress upon a small change of course would bring either across the bow of the other; that by jibing the mainsail the course of the schooner was changed, through yawing, so as to show her red light to the steamer, and that the schooner soon passed to the port side of the steamer, and showed her red light before her yawing was corrected by the wheelsman; that thereafter the steamer's light was hid behind the schooner's foresail; that this tendency to yaw to the eastward continued, and was not fully corrected by the wheelsman, while the mate and the lookout were both employed with the sails; and that when the mate relieved the wheelsman, seeing that the schooner was somewhat off her course, and heading towards the flats, which were in mid-river, he suddenly starboarded his helm, in order to bring the schooner upon her proper course, without at that moment noticing the steamer, whose lights were hid; and that he did not see the steamer until a few moments afterwards, when he was nearly upon her, and when his port wheel was ineffectual to avoid the collision. Whether this be the true explanation or not, I think the weight of evidence and probabilities of the case show that the schooner did make the changes in her course as testified to by the steamer's witnesses, and that the schooner is therefore liable for not properly keeping her course.

I am satisfied, however, that the steamer also was not without fault for shaping her course so near to the line of the schooner's course. , It is plain that when the schooner's last change of course was made the vessels were quite near,—the libelants' witnesses say only about 100 yards distant.   If that is approximately correct, this change was half a minute only before the collision.   In that time the schooner would have moved ahead only about 75 feet, as she was making but a mile and a half an hour, by land.   In that very short distance it is impossible that she could have made much actual change in her position abeam from the line of her previous course, although her head might swing two or three points to the westward.   But in moving through the short curve of 75 feet, or even in going considerably more than that, supposing that she was more than 100 yards distant when she changed her course, she could not bring her stem more than a very short distance—certainly not over 50 or 75 feet—from the line of her previous course; and yet, by the libelants' own story, it was within the limits of such a change only, that this collision occurred; and it follows that the line of the steamer's previous course must have been less than from 50 to 75 feet from the port side of the schooner, while the lights were showing red to red.   I cannot hold this to be prudent or justifiable navigation on the part of the steamer, in the night-time, where there is abundant room to keep properly out of the way, and no excuse for not doing so.   A sailing vessel is, indeed, required to keep her course; but this rule does not mean that her course must be kept with mathematical precision, for that is impossible.   There are often causes of unavoidable deviation, even with the most skillful handling.   This is particularly so with a vessel sailing light, and with the wind aft, when some yawing cannot be prevented.   So, the effects of tides and currents in rivers cannot be precisely counted on.   If the master of a steamer were deliberately to shape his course so as to run within five feet of a sailing vessel, whether by night or day, without cause, no one would question that he was blamable for dangerous and reckless navigation.

The statute of this state, forbidding a steamer to pass another going in the same direction nearer than 20 yards, has often been cited as furnishing an analogy in cases where it is not strictly applicable as a rule of law.   Reasonable prudence, and a due regard for the safety of life and property upon the water, demand that steamers bound to keep out of the way, where nothing prevents, shall keep away by a reasonably safe margin; and that any disregard of this obligation, without excuse, resulting in collision, shall be held a fault.   Upon the libelants' own testimony the steamer had abundant time and opportunity before the schooner's last change, and while the vessels were approaching, red to red, to have kept away by a reasonable distance. During that time she had made at least half a mile, and could, if necessary, have gone far nearer the shore than she did, and have given an ample margin of safety.   Considering that the steamer was

struck by the schooner's cut-water, the margin allowed by the steamer up to the moment of the schooner's last change must have been less than 50 feet. But for this unreasonable proximity to the line of the steamer's course, notwithstanding the schooner's fault, there would have been no collision.

I cannot regard the line of the steamer's course as justifiable navigation, under the circumstances. The liability of the schooner to yaw was known; the proximity of the covered flats in mid-river was known; and the need of the schooner to avoid them by a safe margin was known. The precise location of these flats could not be easily determined at night, and the liability of the schooner to veer again to the westward, possibly from necessity, might have been foreseen. The fault, and the inattention of the mate, and of the wheelsman whom he relieved, were natural, under the circumstances supposed, and, in a sense, excusable, though not amounting to a legal justification. I would by no means intimate that a steamer must keep so far out of the way as to avoid all possible faults of a sailing vessel; but, having in view the great practical ends of all rules of navigation, whether statutory or customary, I am constrained to hold that the close line that the steamer was making upon the schooner's course in this case is not a reasonable and substantial compliance with her maritime obligation to keep out of the way, and for that reason she must also be held in fault, and the damages and costs divided.