## THE ALENE.

### HALL v. THE ALENE.

#### (District Court, S. D. New York. April 27, 1896.)

COLLISION—STEAM AND SAIL—FOG—SCHOONER'S CHANGE OF COURSE—CONFLICT OF EVIDENCE—POSSIBLE NAVIGATION—REVERSING—STOPPING POWER.

The schooner H., close-hauled, heading about N. by W. on her starboard tack, and bound for New York, came in collision off Cape Henry with the steamship A., heading south. There was moderate fog. The steamer, hearing the schooner's fog horn apparently broadening off on her port bow, ported. Soon after the schooner came in sight, when apparently about 1,500 feet distant, and she was seen to be crossing ahead of the steamer's course, whereupon the steamer's helm was put hard-a-starboard, and so continued until collision. The steamer slowed and reversed; she claimed that the schooner when from 500 to 800 feet distant luffed so as to bring her port side against the steamer's stem. The schooner contended that there was no change in her course. Both agreed that the angle of collision was from 5 to 8 points: *Held* (1) upon an analysis of the navigation, that from the admitted bearings of the vessels when first seen, and the angle of collision, there must have been a change of course as contended by the steamer; (2) that the collision would have been avoided but for this change of course; (3) that the steamer reversed as soon as this change was apparent, and was without fault, some unverified estimates of her stopping power being discredited.

In Admiralty—Collision.

Wilcox, Adams & Green, for libellants.
Wheeler & Cortis, for claimants.

BROWN, District Judge. The above libel was filed by the owners of the three-masted schooner John W. Hall, against the steamship Alene to recover the damages for the loss of the schooner through a collision with the Alene at about 2 p. m. of May 5, 1895, at sea about 140 miles west of Cape Henry. The schooner sank a few minutes after the collision and became a total loss.

The steamer was an iron screw propeller about 320 feet long, bound from New York for the West Indies, and until a few moments before the collision was upon a course heading south. The schooner was bound for New York, and was sailing close-hauled on the starboard tack, with the wind from the northeast, and heading about north by west. There was some fog during the half hour before collision, and the steamer sounded her fog whistles regularly. On hearing these whistles the schooner gave a fog signal of a single blast, indicating under the international rules, that she was on the starboard tack. Her whistle was heard and located by those on the steamer as a little upon their port bow. A second signal, heard afterwards, seemed somewhat broader off the port bow, and thereupon the master who had just come upon the bridge ordered the helm of the steamer to be ported. Very soon afterwards, and as it is claimed before the port wheel had turned the steamer's head to starboard, the schooner came in sight, apparently about 1,500 feet distant, and from half a point to a point on the steamer's port bow, and she was seen to be on the starboard tack, crossing the steamer's course. The helm was immediately ordered and put hard-a-starboard, the steamer's bow swung to port, and she would have passed well clear of the schooner to the eastward, as her officers claim, had not the schooner when from 500 to 800 feet distant luffed, on seeing which, the steamer reversed full speed, but too late to avoid running into her port side.

The two vessels came together, as all agree, at a very considerable angle, viz., from 5 to 8 points between their bows. The steamer's bow ran about half way through the schooner, held her fast for a few minutes, after which the schooner dropped awa᷉ and sank. Her crew was saved. The full speed of the steamer was 12 knots, but under reduced steam, according to her officers' testimony, she was making only about 9 knots per hour until the fog signal of the schooner was heard, when she was put at half speed, bringing her speed down to 5 or 5½ knots, until her engines were reversed, probably about a minute and a half before collision.

The men on board the schooner strenuously deny any change of course, and aver that the steamer, when first seen, was about a point on the schooner's starboard bow and heading for the schooner's starboard bow; that she then seemed to change her course somewhat to the westward across the schooner's course; but that all at once she seemed to whirl around to port and head directly for the schooner and kept so until collision. The wind was light from the northeast, and according to the schooner's testimony, she was sailing about north by west, and making only about 2 knots an hour.

The chief issue in the case is whether the schooner did or did not change her course. Upon this issue I am obliged to find in the steamer's favor. All the witnesses agree that the angle of collision between the bows was from 5 to 8 points. Assuming this angle to be but 6 points, it would be impossible to bring these vessels into collision at any such angle from the positions in which both sides place these vessels, without a luff of several points by the schooner. The positions which the witnesses from the two vessels assign to each

other when first seen, and their headings, are almost identical. The steamer, being about a point on the schooner's starboard bow, while the schooner was heading about north by west, must have been in a position almost due north from the schooner. The steamer was heading due south. She would be pointing, therefore, for the schooner's bow, as the latter alleges, and the schooner's starboard side would be visible to the steamer as the latter asserts. It is probable that the steamer would be seen from the schooner somewhat before the schooner could be seen from the steamer. The change of the steamer's heading somewhat to the westward is such as would naturally be produced by the steamer's port wheel, before the schooner became visible to the steamer. The steamer's witnesses, indeed, say she could not have changed her heading under this port wheel. But as a change by the steamer was observed sufficient to lead the mate of the schooner to call out: "She has cleared us; it is all right, sir; he sees us and is keeping away," I think some change was in fact made under this port wheel, and was the one referred to by the mate. But the moment the schooner came in view, and her starboard tack was observed, the steamer's wheel was put hard-a-starboard and was so kept until collision. On drawing a plot of the navigation of the vessels backwards from the time of collision, if their bows are placed in collision at an angle of 6 points, with the schooner heading north by west as the schooner's witnesses contend, it will be seen that the steamer at collision must have been heading east by south; and supposing her to have made one point to the westward under her port helm, it is evident that if the schooner kept her course the steamer must have swung 8 points to port to make an angle of 6 points with the schooner at collision after starboarding her helm. But if the curve of her course in making a change of 8 points be drawn upon any practicable radius, whether that radius be 500 feet, as Captain Sampson thought was possible for the Adirondack (though I wholly discredit this opinion), or whether the radius be taken at the more probable length of 1,000 feet, which is much more nearly in accord with authenticated observations on similar vessels (White, Nav. Arch. 630, 637; The Lepanto, 21 Fed. 664; The Aurania, 29 Fed. 122, note; The Normandie, 43 Fed. 159, note), it will be seen that the position of the steamer when she starboarded her helm must have been from 300 to 750 feet clear to the westward of the line of the schooner's course; that the schooner must have been at that time about 3 points off the steamer's port bow, while the steamer would be at least a point off the schooner's port bow, and altogether clear of her. Such a relative situation of the vessels is not only totally different from the situation sworn to by both, but it would be a situation calling for no maneuvers whatsoever, since the vessels would be plainly clear of each other, and the alleged maneuvers of the steamer would be incredible.

So, on the other hand, if the vessels be placed in the relative positions testified to when first seen, i. e., the steamer at a point representing about 1,500 feet due north from the schooner, and heading south by west (allowing a change of one point under her port wheel), while the schooner is heading north by west, and the curve of the

steamer's course be drawn as before, whether upon a radius of 500 feet or of 1,000 feet, it is obvious that in less than a minute and a half after her helm was starboarded the steamer would have turned to the eastward enough to head astern of the course of the schooner, and that there was no possibility of a collision, except by a strong luff of the schooner to bring her under the steamer's bows. This agrees with the testimony of the captain of the steamer that he was heading for the stern of the schooner when he saw she was luffing. This luff was probably the act of the wheelman alone. The expression of the mate that he saw the steamer whirl around to port, indicates a suddenness of change that could not possibly arise from the turning of a steamer over 300 feet long, but which might have that appearance through the schooner's own luff. Although allegations of such changes by sailing vessels are looked on with suspicion, they have been proved in many cases, and this I am satisfied is one of them. The Potomac, 8 Wall. 590; The Free State, 91 U. S. 200; The Adriatic, 107 U. S. 512, 2 Sup. Ct. 355; The Fair Wind, 12 C. C. A. 611, 64 Fed. 806; The Saale, 59 Fed. 716; The Joseph Stickney, 50 Fed. 624; The Allianca, 39 Fed. 476.

The plotting of the navigation further shows that the steamer would easily have cleared the schooner by continuing on under her original port wheel; while there was also abundant room to go astern of her by starboarding, had the schooner kept her course. It was optional with the steamer to adopt either mode of avoiding the schooner, and the master had a right to assume that the schooner would keep her course. But inasmuch as the master could not be certain of the precise course of the schooner the moment she came in view, nor of her speed, it was undoubtedly the more prudent course to starboard his helm, as he did, for the purpose of going astern. As this maneuver was timely and sufficient, and was thwarted, as I must find, by the schooner alone, through her improper change of course, the latter is primarily responsible for the collision.

2. Is there any fault with which the steamer can be justly charged in not avoiding the schooner, notwithstanding her luff? Manifestly all that the steamer could do was to reverse as soon as the luff was perceived. The officers testify that they did so. I am unable to find upon a critical examination of the testimony, and of the navigation, any solid ground for discrediting this testimony. The evidence indicates that the officers were alert in their attention to the schooner. Their story in all other respects is credible, consistent and probable; and in this particular, reversing as soon as the luff was perceived, which was probably as soon as the schooner had changed a point or a point and a half, was the most natural and obvious course to pursue for the steamer's own safety. I ought, therefore, to accept it, unless there are substantial evidences of its untruth. The only discordant piece of testimony is Captain Sampson's estimate that the steamer could be brought to a full stop from a speed of 5 or 5½ knots, on reversal at full speed, in advancing 150 or 160 feet; and that her speed would be reduced to two knots, about the probable speed of each at collision, in less than half her length, or "from 90 to 100 feet."

If this is correct, not only would such a luff by the schooner when so near the steamer be extremely improbable, but there could not have been time for the schooner to change 3 or 4 points more before the steamer would have come to a full stop by prompt reversal before reaching the schooner after the luff of the schooner should have been perceived; and the collision, if any, must have come about by the schooner's running into the side of the steamer. On reversal, going 5 to 5½ knots, an advance of 100 feet could not possibly have occupied over half a minute, and the schooner in that time could not have advanced over 100 feet; and the vessels on reversal, therefore, would on Captain Sampson's estimate have been less than 200 feet apart; whereas they were from 3 to 4 times that distance. I have no doubt, however, that the estimates of Captain Sampson are entirely mistaken, both as to the turning power, and the stopping power of the Alene. His estimate of the time necessary to reduce from 5 or 5½ knots to 2 knots, viz., two or three minutes, is totally irreconcilable with his estimated advance of 90 to 100 feet only; and his estimate of turning on a radius of 500 feet is also so totally at variance with all other recorded experiments, with common observation of the action of such steamers, and with the testimony before me in many cases, that in the absence of any details of actual experiments made by Captain Sampson I must regard his testimony on these points as utterly mistaken. The estimate of the officers of the steamer was that the schooner was from 500 to 800 feet distant when she was first seen to be luffing, and that the order to reverse was immediately given. There is no reason to suppose that this steamer with a full steam power of only 9 knots, could reduce her speed from 5 or 5½ knots to about two knots—probably about her rate at collision—in less time than a minute and a half, or in advancing less than 350 feet. (The advance while backing is much less than the arithmetical mean during the given time; from half speed to stop the advance is less than 15 per cent. instead of 25 per cent., the arithmetical mean.) The Normandie, 43 Fed. 160, 162, notes 4, 6, 8; The Lepanto, 21 Fed. 664; The Aurania, 29 Fed. 122, note; White, Nav. Arch. 630–637. The schooner in a minute and a half would advance about 300 feet, making a distance therefore of about 650 feet at the time when the steamer reversed. In traversing the distance of 350 feet, the schooner, changing a point in from 75 to 100 feet, might change from 3 to 4 points, making a total change of 4 or 5 points for the schooner, and 3 or 4 for the steamer. I see no such improbability in these estimates, as to furnish any ground for discrediting the testimony of the officers of the steamer. As the steamer, therefore, took proper and timely measures to avoid the schooner, which were thwarted by the latter's improper change of course, and this was not induced by any fault of the steamer (The Elizabeth Jones, 112 U. S. 514, 5 Sup. Ct. 468; The Allianca, 39 Fed. 476), and no subsequent fault being imputable to the steamer, the libel must be dismissed, with costs.