### THE ALENE.

### HALL et al. v. THE ALENE.

#### (Circuit Court of Appeals, Second Circuit.   April 8, 1897.)

COLLISION—STEAMER AND SAIL—CHANGE OF COURSE.

Where a steamer and schooner, in the open sea, on first perceiving each other through a fog, were on courses which, if maintained, would have made collision impossible, and a change by either was denied by witnesses who were on board, *held*, under the circumstances, including especially the angle of collision, and the apparent impossibility of the steamer's making the necessary curve, that the schooner must have changed her course, perhaps unknown to her helmsman by reason of the baffling winds, and, the steamer having reversed promptly, the schooner alone must be *held* in fault.   74 Fed. 268, affirmed.

Appeal from the District Court of the United States for the Eastern District of New York.

Geo. Bethune Adams, for libelants.
Everett P. Wheeler, for claimant.

Before LACOMBE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge.   This is an appeal from the decree of the district court for the Eastern district of New York, which dismissed a libel to recover the damages to the libelants occasioned by a collision at sea.   The facts in the case up to the time just before the collision are clearly stated by Judge Brown as follows:

"The above libel was filed by the owners of the three-masted schooner John W. Hall against the steamship Alene to recover the damages for the loss of the schooner through a collision with the Alene at about 2 p. m. of May 5, 1895, at sea, about 140 miles west of Cape Henry.   The schooner sank a few minutes after the collision, and became a total loss.   The steamer was an iron screw propeller, about 320 feet long, bound from New York for the West Indies, and until a few moments before the collision was upon a course heading south.   The schooner was bound for New York, and was sailing close-hauled on the starboard tack, with the wind from the northeast, and heading about north by west.   There was some fog during the half hour before the collision, and the steamer sounded her fog whistles regularly.   On hearing these whistles, the schooner gave a fog signal of a single blast, indicating, under the international rules, that she was on the starboard tack.   Her whistle was heard and located by those on the steamer as a little upon their port bow.   A second signal, heard afterwards, seemed somewhat broader off the port bow, and thereupon the master, who had just come upon the bridge, ordered the helm of the steamer to be ported.   Very soon afterwards, and, as it is claimed, before the port wheel had turned the steamer's head to starboard, the schooner came in sight, apparently about 1,500 feet distant, and from half a point to a point on the steamer's port bow; and she was seen to be on the starboard tack, crossing the steamer's course.   The helm was immediately ordered and put hard a-starboard, the steamer's bow swung to port, and she would have passed well clear of the schooner to the eastward, as her officers claim, had not the schooner, held her fast for a few minutes, after which the schooner dropped away and sank.   Her crew was saved.   The full speed of the steamer was 12 knots, but under reduced steam, according to her officers' tes-

timony, she was making only about 9 knots per hour until the fog signal of the schooner was heard, when she was put at half speed, bringing her speed down to 5 or 5½ knots, until her engines were reversed, probably about a minute and a half before collision. The men on board the schooner strenuously deny any change of course, and aver that the steamer, when first seen, was about a point on the schooner's starboard bow, and heading for the schooner's starboard bow; that she then seemed to change her course somewhat to the westward across the schooner's course, but that all at once she seemed to whirl around to port, and head directly for the schooner, and kept so until collision. The wind was light from the northeast, and, according to the schooner's testimony, she was sailing about north by west, and making only about two knots an hour."

The libelants rely upon alleged acts of omission or of commission on the part of the steamer prior to her final change of course, which they think contributed to the disaster. It is said that her speed in a fog was excessive, that she did not stop as soon as she heard the schooner's signal, and that the first order of her captain to port her wheel was erroneous. But it is apparent that just before the collision the vessels were in safety with respect to each other; that, if no change of either had taken place, they would have passed each other without harm; and that the accident was caused by a final and useless change of course on the part of one of the vessels. The unnecessary character of this change, by whomsoever it was entered upon, creates the perplexing difficulty in this case, for, in addition to the ordinary contradictions of the witnesses, there is the fact that each party attributes the collision to an act of the other which was apparently without reason. The district judge thought that the change of course was by the schooner. He reaches this conclusion from the story which is told by the angle of collision, and by a plot of the navigation of the vessels backward from the time of collision, upon the theory that the schooner kept her course. We think that the conclusions of the district judge are verified by the proved circumstances of the case, among which the angle of collision is prominent. The concurrent testimony of the witnesses on both vessels is that, as they were first visible to each other, if both had kept their courses and their speeds, they would have collided. The steamer was heading south, and was nearly north of the schooner, which was heading about north by west; and the steamer was about a point on her starboard bow, and was coming directly towards her bow. It is conceded by the steamer that when her captain first came on deck, after he had heard the schooner's signal, and before he saw her, he ordered the helm of the steamer to be ported, and that the helmsman began to obey this order, and that when the schooner came in sight, and was seen to be on the starboard tack, the steamer's wheel was put hard a-starboard. The schooner's witnesses think that the first order was carried into effect, and that the steamer, under the influence of a port wheel, headed somewhat to the westward. The steamer's witnesses say that the order was so quickly countermanded that she could not have perceptibly turned to the starboard. We are inclined to the opinion that the change under the first order to port must have been slight, but, be that as it may, the steamer's wheel was subsequently and immediately put hard a-starboard, and she

79 F.—62

swung to port. The theory of the schooner is that she did not change her course, but that, after the steamer had ported, and went away to leeward, in the language of the schooner's mate, "she whirled right around, and headed directly for us again." The steamer's bow struck the schooner on her, port bow forward of her fore rigging, at an angle of at least six points. If the schooner was on her former course, it would seem almost impossible of belief that the steamer could make the curve which it was necessary for her to make in order to strike the schooner nearly at right angles on her port bow, in the time and with the speed which she had. When the steamer slowed, the vessels were about 1,500 feet apart, and she was slowing for 4 minutes, and she reversed for 1½ minutes. In order to strike the schooner at an angle of six points on her port side, it would require more time and greater speed to make the necessary semicircular curve, and run the necessary distance. Furthermore, if the steamer's helm was starboarded when the schooner came into view (and it must be taken as proved that this was done), and the schooner had kept her course, the steamer would have been, in the time which she had for forward movement, so far eastward as to be away from the course of the schooner, without probability of collision. The libelants urge strenuously that the first order to port was wrong, and that the collision happened because the steamer, having changed her course to starboard, and crossed the course of the schooner, unsuccessfully tried to recross it. Assuming that this order was improper, it was not, we think, the cause of the collision, because, as has just been said, the steamer would have been out of the way of the schooner if, for some unknown reason, the schooner had not changed her course, which brought about the unfortunate result. The reason for the schooner's luffing is well-nigh inexplicable. The helmsman was not steering by the compass, but by the wind, which was baffling, and the most probable explanation is that there might have been a change of the wind, which, unconsciously to those on board, who were watching the steamer, caused a change of course. The decree of the district court is affirmed, with costs.