### THE SENATOR SULLIVAN.

#### THE TALLAHASSEE.

(District Court, E. D. New York. July 10, 1902.)

1. COLLISION—THEORY—IMPOSSIBILITY.

A contention, in an action for collision between a steamer and a schooner, that the steamer crossed the schooner's bow, and changed her course within the limits of a few hundred feet, so as to strike the starboard bow of the schooner at a right angle, should be rejected as unreasonable and impossible.

2. SAME—EVIDENCE.

Where, in an action for collision between a steamer and a schooner, the evidence of the officers of each as to the courses of the other and their courses could not be harmonized with the happening of the collision, and the wheel of the schooner was controlled by a young man, whose evidence showed that he had no knowledge of navigation, it will be *held* that the collision resulted from the fault of the schooner's helmsman.

Davies, Stone & Auerbach (Julien T. Davies and Herbert Barry, of counsel), for the Tallahassee.

Convers & Kirlin and Carver & Blodgett (J. Parker Kirlin and Eugene P. Carver, of counsel), for the Senator Sullivan.

THOMAS, District Judge. The above actions involve a collision between the four-masted schooner Senator Sullivan and the steamer Tallahassee; the former bound for New York, and the latter for Savannah. The collision occurred on November 4, 1899, at about 9:40 p. m., off Seagirt, N. J. The night was dark and clear; the sea was smooth, with a fresh breeze blowing from a westerly direction,

as more particularly noticed hereafter. The schooner's claim is that she was sailing with a fair wind on the port tack, heading N. by E., with proper side lights, a man on the lookout, another at the helm, the mate in charge of the watch, and the captain on deck from time to time; that the bright light, and afterwards the green light, of a steamer were seen about two points from the schooner's port bow; that later the green light was seen across the bow of the schooner from port to starboard, when the steamer suddenly changed her course, showed both lights, shut out her green light, and struck the schooner between the cathead and stem at a right angle; that just as the red light began to show the mate attempted, with the assistance of the man at the wheel, to luff up by putting the wheel hard down, but that the vessel had no time to obey her helm appreciably, and did not more than a quarter to half a point. In other words, the schooner's statement is that, having seen on the schooner's port bow the green light of the steamer, the steamer came across the bow of the schooner until the green light showed on the latter's starboard bow, and that then the steamer suddenly went to starboard so as to show her red light, when away not over one or two lengths, or two or three hundred feet, and half a point on the schooner's starboard bow, and came forward, striking the schooner at a right angle. With the intrinsic improbability of the narration in mind, the claim of the steamer may be considered. It is that she was on a course of S. W. by S. when she saw, about two points on her starboard bow, the red light of the schooner, on a course of N. E. by N. ½ E.; that the second officer ordered the helm to port, and later hard a-port; that the steamer swung to the starboard and windward of the schooner, whose red light traveled across the steamer's stem to about a point on her port bow, and that the vessels were related red to red; that shortly the green light of the schooner showed about one and a half points on the port bow of the steamer, both lights being visible; that the schooner then shut out her red light under her down helm, and showed her green light broad; that, when the green and red lights of the schooner both showed, the captain of the steamer signaled for full speed astern, the order was promptly obeyed, the helm being kept hard a-port, but that about two minutes afterwards the vessels met almost at right angles, the steamer then heading about S. W. by W.; that the impact carried the schooner's head around, so that in the end both vessels were heading in the same direction. From this claim of the steamer it appears that the steamer, seeing the red light two points off her starboard bow, went to starboard, so as to bring such red light on her port hand, in order that the vessels might pass red to red, giving the schooner the entire seaway; that while she was doing this under a hard a-port helm, the schooner left her course of N. E. by N. ½ E., and went about to westward sufficiently to strike at right angles the steamer heading S. W. by W., which involved a change in the schooner's course of about seven points. Hence the schooner's claim is that the steamer in the first instance tried to cross her bows, which would have been error, and after having done so, when within two lengths of her, changed her course about nine points, and caused the collision; while the

117 F.—12

steamer claims that, after having changed her course to starboard three points, the schooner meanwhile changed her course seven points, and caused the collision. Is the truth ascertainable? If so, what is it? The steamer asserts that when she first discovered the schooner she saw only her red light, which was two points on the steamer's starboard bow. But the schooner claims that she was heading N. by E. If the steamer was heading S. by W., and the schooner N. by E., the vessels were on parallel courses, and could not have shown green to red, as both parties claim. The steamer, to escape this dilemma, puts the heading of the schooner at N. E. by N. ½ E., and the schooner in turn charges that the steamer was heading E. of S. Either the steamer was not heading S. by W., or the schooner was not heading N. by E. Each vessel, to enforce her contention, alleges that the other was about 2½ or 3 points to the eastward of the course claimed by her; that is, the schooner claims that the steamer was headed about S. S. E. ½ E., while the steamer claims that the schooner was headed N. E. by N. ½ E. It is highly improbable that the steamer was heading easterly of south, and there is a strong probability in favor of her regular course of S. by W. There is not so great improbability in the schooner being farther to the eastward than she claims. In either case the red light of the schooner would be opposed to the green light of the steamer. There was every reason for the steamer porting, rather than crossing the bow of the schooner. But the absurd contention remains that the steamer did cross the schooner's bow, and went about within the limit of a few hundred feet, so as to strike the starboard bow of the schooner at about a right angle. This contention must be rejected as impossible, following similar holdings in The Laura v. Rose (D. C.) 28 Fed. 104; The Fair Wind (D. C.) 55 Fed. 1017; The Alene (D. C.) 74 Fed. 268; Id., 25 C. C. A. 264, 79 Fed. 976; Id., 168 U. S. 710, 18 Sup. Ct. 942, 42 L. Ed. 1212. But if the steamer went to starboard at a distance from the schooner, what caused the collision? There could be but one way of accounting for it, and that is that the schooner luffed, passing from her course of N. N. E. to the westward, so that she was heading, at the time of the collision, N. W. by N. Why should the schooner luff? The evidence of the wind and trim of the schooner as given by her mate is that the wind was unsteady, and from W. to W. N. W.; that all the sails except the topmast staysails were set; and he adds: "We had our sheets hauled aft on account of the wind backing back and forth. Our sails were full, but we were not closehauled. Our sails were full, and our sheets were hauled aft, but we kept them aft on account of the wind backing and filling between W. N. W. and W." The steamer claims that the wind was blowing from W. S. W. to W. At the wheel of the schooner was a colored man, twenty-two years of age, who had been at sea for three years. It is impossible here to point out the grotesque features of his evidence, his wide and wild statements concerning the events of the night, and his ignorance of navigation there or elsewhere. It is enough that he was a totally unfit man to act as helmsman, and likely to commit any error. Yet he was placed at the helm, the compass was some 4½ feet in front of him, and he was

expected to keep his eyes on it, and steer the vessel with reference to it. Upon the examination he was doubtful whether there were 50 or 52 points in the compass. His first evidence showed that the wind was N. by W. or N. N. W., and that he was sailing upon a course of N. by E., although later in his examination he places the wind farther to the westward. This first location of the wind harmonized with his evidence that he could sail within two or three points of the wind. He was asked this question: "Q. Suppose the wind was north, and she was on the starboard tack, closehauled, what course would she steer? A. N. by E., or N. N. E.; something like that." He seemed to be uncertain whether objects were on the lee or windward side of his vessel, or how the green light of the ship appeared when he first saw it. He was asked: "Q. What was the steamer's course when you first saw her, as near as you can figure? A. I don't know. Q. Was she inshore from where you were, or further out? A. Oh, she was inshore, coming out, she was,—the steamer. Q. She was coming out from the shore? A. Yes. Q. Heading what direction? A. Well, she was heading, I guess, about N. E., or something like that. Q. What? A. N. W. I don't know how she was heading. That is the truth." It is a very grave question how this accident happened. That it did not happen in the manner stated by the schooner is beyond peradventure. Did it happen as the steamer claims? One may believe that with difficulty. But either the steamer went to windward and ran into the schooner, or the schooner went to windward and ran into the steamer. It is more probable that such a helmsman as the schooner employed allowed his vessel to luff, and run into the steamer, than that the steamer, with its trained officers, made the aberrating movement claimed by the schooner. It is true that there are defects in the evidence of the crew of the steamer. The mate and master of the schooner testified that they had knowledge of the schooner's compass and course. Indeed, at the very instant preceding and following the collision the schooner's master asserts that he stood before the compass, noticing the precise heading of his vessel. That is not without the domain of possibility, but the evidence of one side must yield, and the probabilities seem to be with the steamer.

Upon the whole case it is a fairer judgment that the schooner's helmsman caused the accident. Therefore there will be a decree against the schooner and in favor of the steamer.